UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

B.W., by and through his guardian A.W.,

                          Plaintiff,

          -against-

EIHAB HUMAN SERVICES, INC.; FATMA
ABBOUD; ROSE JEAN-PIERRE; and FAWZI
ABU HASHISH,

                          Defendants.
----------------------------------------------------------------x

FILED
CLERK

2012 JUL 18 AM 10: 55

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

CV 12 Civ. ——3550

**COMPLAINT**

TOWNES, J.

**JURY DEMAND**

LEVY, M.J.

SUMMONS ISSUED

Plaintiff B.W., by and through his guardian A.W., as and for his Complaint alleges as
follows:

## NATURE OF THE CASE

1.       B.W. is a young autistic man who was severely abused, neglected, and almost

killed while entrusted to the full-time care and supervision of Eihab Human Services, Inc.

("Eihab"). B.W. moved into Eihab's Brooklyn residence for adults with developmental

disabilities in August 2008, shortly after he turned 21 years old. He had never before been

hospitalized. Eihab took B.W.'s benefits under the Medicaid Act and was required to provide

him with around-the-clock and personalized attention in order to ensure that he remained

healthy, safe, and thriving.

2.       Within nine short months at Eihab, however, B.W. was rushed to the hospital *six*

different times. Careless, negligent, and reckless supervision by Eihab employees resulted in his

near death due to choking on a corncob. Within three months, B.W. lost fifty pounds due to

Eihab's negligence and reckless disregard for his health and well-being. His weight sunk to a

low of *56 pounds* and a feeding tube was inserted into his body to avoid starvation.

3.      Eihab's employees, and B.W.'s supposed caretakers, severely injured and neglected B.W., causing his malnourishment, weight loss, unexplained cuts and bruises, and a complete change in B.W.'s disposition from a cheerful young man to an emaciated and frightened person.  Rather than admitting their failure to supervise and care for B.W. properly, Eihab and its employees hid their wrongful actions and ignored their obligations to provide B.W. with follow-up treatment and care.

4.      Such callous and inhumane disregard for B.W.'s rights violates federal and state law designed to protect the disabled from abuse and discrimination, as well as New York State common law.

5.      This action arises under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794 *et seq.* and implementing regulations, the Medicaid Act, 42 U.S.C. § 1320 *et seq.*, and Federal Nursing Home Reform Act (the "FNHRA"), 42 U.S.C. § 1396v *et seq.*, and implementing regulations, Article 15 of New York State Executive Law (the "New York State Human Rights Law") and implementing regulations, Title 8 of the Administrative Code of the City of New York (the "New York City Human Rights Law"), and state common law.

## JURISDICTION AND VENUE

6.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a), 1367(a).

7.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

8.      B.W. was born in 1987.  At all times relevant to this action, he resided in Brooklyn, New York.  He currently resides in Queens, New York.  He is a 25-year-old young

man, who has been diagnosed with autism and severe mental retardation since a young age. While under the care and supervision of Eihab, B.W. suffered serious, life-threatening physical injuries. B.W. resided in the group home operated by Eihab at 109 Pilling Street, Brooklyn, New York. All the events giving rise to the complaint occurred in or near Brooklyn, New York.

9.     A.W. is B.W.'s mother. A.W. resides in Brooklyn, New York. A.W. has been appointed Guardian for B.W. by Kings County Surrogate's Court pursuant to Article 17-a of the New York Mental Hygiene Law.

10.     Eihab Human Services, Inc. is a not-for-profit organization incorporated under the laws of the State of New York. Its main office is located at 168-18 South Conduit Avenue, Springfield Gardens, New York, 11434. Eihab provides Medicaid support services, in-home rehabilitation and support services, after-school programs, and residential group homes in Brooklyn and Queens for individuals with developmental disabilities. It owns and operates daytime educational and rehabilitative programs as well as several adult residential facilities and group homes, known as Individualized Residential Alternatives ("IRA"), one of which is located at 109 Pilling Street, Brooklyn, New York (the "Pilling Street Home"). As a provider of services to the developmentally disabled, Eihab is licensed, regulated, and monitored by the New York State Office for People with Developmental Disabilities ("OPWDD"), through its Brooklyn Developmental Disabilities Office ("DDSO").

11.     Eihab is responsible for the operation of the Pilling Street Home, including providing a program of services, care and supervision which is supposed to protect the rights of Pilling Street Home residents and promote the physical and mental well-being of the residents, and must comply with the Rehabilitation Act, FNHRA, New York State Human Rights Law,

3

New York City Human Rights Law, New York Mental Hygiene Law, New York Social Security Law §§ 460-461-h, and their respective implementing regulations.

12.     Fatma Abboud is the Chief Executive Officer ("CEO") of Eihab Human Services, Inc. and she held this position at all times relevant to this complaint. Abboud, as CEO, was and is responsible for the policy, practice, supervision, implementation, and conduct of all Eihab matters and was and is responsible for the hiring, training, supervision, discipline, retention, reporting, staffing, and conduct of all Eihab personnel, including the defendants referenced herein. As CEO, Abboud was and is responsible for the care and custody of all individuals residing in or attending programs at Eihab's facilities, including at the Pilling Street Home. On information and belief, Abboud was and is provided with regular reports of suspected and substantiated staff abuse of B.W. and others at the Pilling Street Home as well as all other Eihab facilities. At all relevant times, Abboud was and is responsible for enforcing the rules of Eihab, and for ensuring that Eihab personnel obey the laws of the United States and of the State of New York. At all relevant times, Abboud was acting within the scope of and in furtherance of her employment.

13.     Rose Jean-Pierre is the Director of Residential Services of Eihab, a position she held at all times relevant to this complaint. On information and belief, as Director of Residential Services, Jean-Pierre was and is responsible for the hiring, training, supervision, discipline, retention, reporting, staffing, and conduct of Eihab personnel, including the defendants referenced herein, who worked at Eihab residential facilities, including the Pilling Street Home. As Director of Residential Services, Jean-Pierre was and is responsible for the care and custody of all individuals residing in or attending programs at Eihab's residential facilities, including at the Pilling Street Home. Jean-Pierre was and is responsible for creating plans of protective

oversight and behavior support plans for B.W. and other individual residing at Eihab facilities. On information and belief, Jean-Pierre was and is provided with regular reports of suspected and substantiated staff abuse of B.W. at the Pilling Street Home as well as all other Eihab facilities. Jean-Pierre withheld information regarding B.W.'s injuries and the subsequent investigation from B.W.'s family. At all relevant times, Jean-Pierre was and is responsible for enforcing the rules of Eihab, and for ensuring that Eihab personnel obey the laws of the United States and of the State of New York. At all relevant times, Jean-Pierre was acting within the scope of and in furtherance of her employment.

14.   Fawzi Abu Hashish was the Director of Quality Assurance of Eihab at all times relevant to this complaint. On information and belief, as Director of Quality Assurance, Mr. Abu Hashish was responsible for receiving and investigating reports of suspected and substantiated reports of abuse of individual enrolled in Eihab's residential and non-residential programs. Mr. Abu Hashish was provided with regular reports of suspected and substantiated staff abuse of B.W. at the Pilling Street Home as well as at other facilities. At all relevant times, Abu Hashish was responsible for enforcing the rules of Eihab, and for ensuring that Eihab personnel obey the laws of the United States and the State of New York. At all relevant times, Abu Hashish was acting within the scope of and in furtherance of his employment.

## JURY DEMAND

15.   Plaintiff demands trial by jury in this action.

## FACTS

### B.W.'s Childhood and Adolescence

16.   B.W. was born in 1987.

17.     From a young age, B.W. was developmentally delayed. He was diagnosed with autism and mental retardation. Today, B.W. is non-verbal and expresses himself through vocalizations and gestures.

18.     For several years, A.W. cared for B.W. at home, while raising B.W.'s siblings, K.W. and Av.W. Eventually, B.W. needed more care than A.W. could provide at home.

19.     A.W. enrolled B.W. in The May Institute in Massachusetts. While there, B.W. learned to sign, say "I love you," and explore his love for music, nature, and swimming.

20.     When B.W. was about ten years old, he moved from the May Institute to Lakeview Neurorehabilitation Center in New Hampshire. B.W. lived at Lakeview until he turned 21 years old, at which time the state funding for his placement at Lakeview ended.

21.     At the time B.W. left Lakeview, he had an individualized education plan ("IEP"). During all daytime hours, beginning from the time he woke up to the time he went to sleep, B.W. required "one-to-one supervision," meaning that one staff member would be assigned to care for him.

**B.W. Comes to Eihab**

22.     Shortly before B.W.'s 21st birthday in 2008, A.W. began looking for a new residential placement for B.W. in New York. She visited several full-time residential facilities for developmentally disabled adults, including state-operated homes and homes operated by non-profit organizations.

23.     A.W. learned of Eihab through the Brooklyn DDSO, the arm of the New York State Office of People with Developmental Disabilities that regulates and monitors non-profit organizations with residences for developmentally disabled adults.

24.     A.W. and K.W. visited Eihab's residential facilities and met several times with Abboud, Eihab's CEO, and Abu Hashish, Eihab's Director of Quality Assurance, to discuss B.W.'s potential placement with Eihab.

25.     A.W. and K.W. visited Eihab's Pilling Street Home. At this apartment building, Eihab claimed to provide around-the-clock care, education, training, and medical services to no more than eight adults with developmental disabilities.

26.     Eihab also offered a day program that B.W. and other disabled adults could attend. At the day program, adults participated in various activities, excursions, and therapy.

27.     Of all the places that A.W. saw, Eihab's Pilling Street Home appeared to be the best placement. It was newly renovated and the apartments were large, clean and well-lit.

28.     Abboud enthusiastically described how B.W. would be involved in stimulating activities in the day program, while receiving the one-to-one care and supervision he needed from Eihab employees. She claimed that the day program had a social calendar, which provided for community excursions to the zoo, movies, walks, and the aquarium.

29.     Abboud also stated that occupational, physical, and speech therapists would visit B.W. regularly for treatment. She stated that Eihab would enroll B.W. in various therapies to address toileting and rumination, and would assist in B.W.'s attendance at music therapy.

30.     Abboud stated that Eihab would provide B.W. with the one-to-one supervision and regular toileting care that he required. She stated that B.W. would be safe and secure at Eihab, and that his medical needs would be addressed.

31.     Based on their visit to the Pilling Street Home and Abboud's copious representations and promises, including that B.W.'s specific care and one-to-one supervision

requirements could be met, A.W. and K.W. decided that B.W. would move into the Pilling Street Home.

**Eihab's Services for B.W.**

32.     In early August 2008, B.W. moved into the Pilling Street Home. A.W. and K.W. helped him move into his apartment. They unpacked B.W.'s clothes, food, and personal belongings, all of which A.W. had purchased and brought for B.W.

33.     On information and belief, Eihab possessed a copy of the IEP prepared by Lakeview. Eihab further created a behavior support plan ("BSP") and a plan of protective oversight ("PPO") for B.W. The BSP and PPO described B.W.'s need for constant one-to-one supervision while in his residence and while he was in the community. One-to-one supervision would prevent B.W., who walked with an unsteady gait, from falling. In addition, since B.W. often explored his environment by placing objects and food in his mouth, one-to-one supervision would prevent choking hazards. When B.W. was sleeping, a staff member was assigned to be on duty on the floor where B.W. and one other resident slept. One-to-one supervision was unnecessary only when B.W.'s family visited him at the Pilling Street Home, took him into the community, or took him to their homes.

34.     The BSP and PPO also outlined the need for routine toileting to ensure that B.W. did not soil his clothes. Routine toileting meant that an Eihab employee was required to take B.W. to the toilet every two hours to provide him with an opportunity to go to the bathroom and thereby avoid accidents. The staff member was also required to assist B.W. with cleaning.

35.     At the Pilling Street Home, B.W. was supposed to be examined by a residence nurse employed by Eihab on a regular basis. On information and belief, the residence nurse reviewed B.W.'s prescribed medical treatments to ensure that they were implemented in

8

accordance with the prescribing physician's orders. In addition, on information and belief, the residence nurse evaluated B.W. for symptoms that would require further medical attention.

36.     At Eihab's day program, Eihab was responsible for providing B.W. with activities throughout the day, both inside the facility and outside in the community.

37.     Eihab was also responsible for transporting B.W. to and from his doctor and dentist appointments, to any physical or music therapy appointments, and to other service provider sites.

38.     Eihab was also responsible for ensuring that B.W.'s personal belongings, such as clothes, toiletries, food, and music player, remained with him and were not lost or stolen.

39.     Finally, Eihab was responsible for receiving, maintaining, and disbursing B.W.'s governmental benefits, including Social Security Disability payments.

40.     As compensation for these services, Eihab received payment from the state of New York under the Medicaid program, since B.W. was enrolled in Medicaid.

**B.W.'s Mistreatment by Eihab Begins**

41.     Despite the promises and representations made by Abboud regarding the level and quality of care and supervision provided by Eihab's employees, B.W. soon began to be mistreated by Eihab and its employees.

42.     The morning after B.W. moved into the Pilling Street Home, A.W. received a call from the Pilling Street Home's manager Chantal (last name unknown). Chantal characterized B.W.'s first night at the home as "awful" and told A.W. that he had defecated on himself. The house manager appeared to blame B.W. despite the IEP, BSP, and PPO clearly setting forth B.W.'s toileting needs.

9

43. Next, A.W. visited B.W. on his first day at Eihab's day program. She was shocked to find B.W. sitting in a warehouse with only a few folding chairs and tables. The floors were extremely filthy. B.W. and his fellow residents were simply sitting in chairs without receiving any attention from the Eihab employees who worked at the day program. There was no indication of the music, art, or excursions to the community promised by Abboud.

44. A.W. and K.W. soon learned that these two incidents were representative of the type of care and supervision that B.W. received at the day program and at the Pilling Street Home.

45. On visits to the Pilling Street Home, A.W. and K.W. would often find that B.W.'s clothes were soiled and that he had been sitting in his wet clothes for hours without being changed. Similarly, B.W. was routinely soiled when he arrived at K.W.'s house for visits.

46. A.W. and K.W. learned that the Eihab employees assigned to one-to-one supervision of B.W. were poorly trained and often did not have specialized education in the care of individuals with developmental disabilities.

47. A.W. and K.W. also learned that Eihab failed to transport B.W. to weekly music therapy classes that A.W. and K.W. had painstakingly arranged for him. Although the music therapy classes were supposed to be paid for by B.W.'s governmental benefits, A.W. and K.W. paid for them with their personal funds due to Eihab's inability to use B.W.'s government benefits to pay for the music therapy.

48. Despite Abboud's promises, B.W. was not regularly seen by licensed physical, occupational or speech therapists.

49. Eihab also failed to carry out their responsibility to ensure that B.W. received necessary medical and dental care. In November 2008, B.W. needed to have a back tooth

10

extracted. Due to Eihab's incompetence, A.W. and K.W. scheduled the appointment themselves and then waited for over a month to receive clearance from Eihab for B.W. to attend the appointment. In the end, however, Eihab never took B.W. to the extraction appointment.

50. On information and belief, Eihab billed Medicaid and received compensation for B.W.'s transportation despite failing to provide him with transportation to some of his appointments.

51. A.W. noticed that, despite providing B.W. with numerous articles of clothing and socks, many of B.W.'s clothes and socks were missing. When A.W. questioned Eihab staff about the lost items, Eihab staff could not tell her where B.W.'s personal items were.

52. Eihab employees often took weeks to respond to A.W. and K.W.'s requests for information regarding the amount of Social Security benefits Eihab had received from the government for B.W.'s benefit. When B.W. left Eihab's care, Eihab initially told A.W. that only $900 dollars in his account remained, but later acknowledged, after an inquiry from DDSO, that B.W. actually had $1,200 remaining.

53. Within a few months of witnessing Eihab's inadequate and dangerous care and supervision of B.W., A.W. and K.W. began looking for new residential living facilities for B.W. While they did so, they struggled to ensure that B.W. received the proper one-to-one supervision that his IEP, BSP, and PPO required.

**Eihab's Lack of Care Results in B.W.' Near Death Due to Choking**

54. On or about February 2, 2009, B.W. was under the care and supervision of Eihab and its employees at the Pilling Street Home.

11

55.     On information and belief, two Eihab staff members named Jemelle Last Name Unknown ("LNU") and Deandre LNU worked at the Pilling Street Home that night and were responsible for the care of eight residents.

56.     On information and belief, Jemelle, a young man who was 19 years old, supervised B.W. while he ate dinner. On information and belief, Jemelle was untrained in administering the Heimlich maneuver or responding to a choking resident.

57.     Eihab possessed strict instructions, including those contained in B.W.'s IEP, BSP, and PPO, not to provide B.W. with food containing hard parts, bones, or seeds, because B.W. was unable to separate the parts of the food.

58.     Eihab also possessed strict instructions, including those contained in B.W.'s IEP, BSP, and PPO, that B.W. should not eat his meals near other people eating, since B.W.'s curiosity often led him to try and eat other people's food.

59.     Nevertheless, Defendants placed B.W. into the care of an untrained teenager.

60.     Jemelle then placed a corncob near B.W. while he ate dinner. B.W. grabbed the corncob and attempted to swallow it whole. He began to choke when the corncob lodged in his throat.

61.     B.W. started choking to death. Jemelle was alone with B.W. downstairs. Jemelle started crying for help. Jemelle had no idea how to save B.W.

62.     Luckily, Deandre, another staff member, was on an upper story of the building.

63.     Deandre ran downstairs and performed the Heimlich maneuver on B.W. B.W. spit up the corncob from his throat.

64.     Noticing that B.W. had coughed up blood in addition to the corncob, Deandre called 911.

12

65.     Deandre next called Jean-Pierre to inform her that B.W. had choked and was being taken to the hospital. On information and belief, Jean-Pierre told Deandre not to call B.W.'s family to notify them that he had almost died. On information and belief, Jean-Pierre stated in sum or substance, "We have to stick together on this."

66.     Deandre next called K.W. and told her that B.W. had choked and was being taken to the hospital.

67.     A.W. rushed to Woodhull Hospital to discover B.W. kneeling over and ruminating constantly. She examined B.W. and found that his adult diaper, long johns, and socks were soaked with urine. Although Jemelle had accompanied B.W. to the hospital, Jemelle ignored B.W. soiling himself. Allsyon noticed that B.W. did not have with him his list of medications, an essential piece of information for any treating physician.

68.     After finding Jemelle at the hospital, A.W. questioned him. Jemelle falsely told A.W. that B.W. had grabbed a corncob off of a fellow resident's plate, despite the fact that Jemelle was the one who had placed the corncob near B.W.

69.     Jemelle, the untrained teenager, was apparently the only Eihab employee at the hospital. But he too left the hospital in disregard of his duty and Eihab's duty to provide one-to-one supervision for B.W. at all times. A.W. was left to assist hospital staff in applying an IV, securing x-rays and an EKG, and overseeing B.W.'s medical treatment.

70.     After several days recovering in the hospital, B.W. was discharged. A doctor at the hospital told K.W. that B.W. had a laceration in his throat. He was sent to Eihab with a prescription for a pureed food diet while he continued to recover from the choking incident.

71.     A.W. and K.W. immediately complained to Abboud, Jean-Pierre, other Eihab employees, and the Brooklyn DDSO that Eihab had failed to properly supervise B.W. in the

Pilling Street Home and at Woodhull Hospital, that Eihab had placed B.W.'s life in danger, and that Eihab's actions led to B.W.'s injuries.

72.    Eihab investigated the incident, found that its employees had left a corncob within B.W.'s reach, but concluded that it was an "accident." To date, A.W. has not received a copy of OPWDD's or DDSO's review of the Eihab investigation.

**Eihab Staff Physically Abuse B.W.**

73.    While B.W. recuperated from the choking incident, he subsisted on a meager pureed food diet that made him frail and weak. In this vulnerable condition, Eihab employees repeatedly struck B.W. and used harsh physical treatment when they interacted with him. The physical assaults by Eihab staff were systemically covered up by Eihab and its employees.

74.    During the days of February 22, 23, and 24, 2009, while in the care and custody of Eihab and its employees, B.W. sustained a bruise under his left eye, two knots on his forehead and his left temple, a cut on his finger, an abrasion on his foot, an abrasion on his shin, cuts on his back, and a severe bruise on his left hip.

75.    On information and belief, Deandre LNU, an Eihab employee, noticed on February 22, 2009 that B.W. had scratches on his body. Deandre reported these marks to her supervisor, Jackie LNU, who, in turn, reported these marks to Jean-Pierre on February 23, 2009. On February 23, 2009, another Eihab employee also noticed that B.W. had scratches on his body.

76.    On or about February 24, 2009, K.W. visited B.W. at the Pilling Street Home. K.W. immediately noticed B.W.'s bruises, knots, cuts, and abrasions. On information and belief, Jean-Pierre still had not examined B.W. despite being told about his injuries.

77.    K.W. spoke to Eihab employees, including Deandre LNU and Jackie LNU, about B.W.'s injuries. Deandre LNU informed K.W. that she and other Eihab employees at the Pilling

14

Street Home saw frequent bruises on B.W.'s body and knots on his head when he returned home after Eihab's day program. Jackie LNU told K.W. that B.W.'s injuries had been reported to Jean-Pierre.

78. K.W. immediately called 911, the police department, and Ms. Jean-Pierre. B.W. was taken to Methodist Hospital to treat these injuries. Doctors at Methodist Hospital diagnosed B.W. with multiple abrasions and noted their clinical impressions as "possible abuse."

79. Eihab, through defendant Abu Hashish, conducted an "investigation" into B.W.'s injuries. Eihab's employees blamed B.W. for self-inflicted injuries. On information and belief, Abboud, Jean-Pierre, and/or another Eihab employee spoke to the Methodist Hospital's social worker to persuade her that B.W. had not been abused, but rather had fallen on the floor and against the wall. Another set of Eihab employees constituting the "incident review committee" concluded that B.W.'s injuries were caused by a restraining device used during B.W.'s dentist appointment on February 24, 2009. B.W.'s injuries, however, were located in places that did not correspond to the Velcro straps on the restraining device, including the abrasion on his leg, and pre-dated his February 24, 2009 dentist appointment.

80. On information and belief, Eihab terminated Jackie LNU because the employee had called K.W. to notify her of B.W.'s injuries.

81. DDSO, the arm of OPWDD with monitoring responsibilities over Eihab, conducted its own investigation of B.W.'s injuries. Based on an interview with B.W.'s dentist, DDSO found no evidence that the restraining device caused B.W.'s injuries.

**B.W. Goes to the Hospital Again**

82. A few weeks later, on or about March 17, 2009, B.W. was *again* taken by Eihab employees to the Methodist Hospital emergency room.

15

83.     Earlier that day, Eihab employees at the Pilling Street Home noticed that, when B.W. returned from the day program, his adult diaper was wet. This indicated that Eihab employees at the day program had not taken B.W. to the toilet every two hours as required by the one-to-one supervision and toileting schedule.

84.     While cleaning B.W., the Eihab employees noticed that the palms and backs of B.W.'s hands were extremely red. Concerned, they took him to Methodist Hospital.

85.     A.W. and K.W. met B.W. and Eihab employees at the hospital. A doctor told A.W. and K.W. that B.W.'s red hands could be caused by someone squeezing, hitting, or tightly holding B.W.'s hands.

86.     Eihab conducted a quick investigation of A.W. and K.W.'s allegations that B.W. had been treated roughly. All of Eihab's employees denied causing B.W.'s hand to become red and claimed that he had not been engaged in activities that would lead to redness. Despite the unanswered questions over how B.W.'s hands became red, Eihab concluded that B.W. had not been physically abused by its employees. To date, A.W. has not received a copy of OPWDD's or DDSO's review of the Eihab investigation.

**Eihab Starves B.W., Almost Killing Him**

87.     On or about March 11, 2009, Abboud told A.W. and K.W. that she had scheduled a swallowing test for B.W. to determine whether B.W. had recovered from the choking incident.

88.     A.W. and K.W. soon learned that Abboud and Eihab employees had never, in fact, scheduled a swallowing test for B.W. Instead, when Eihab employees took B.W. to the medical center, they were told that a swallowing test had not been scheduled. The Eihab employees left the medical center without scheduling an appointment.

89.     On or about March 12, 2009, K.W. learned that B.W. was still receiving a pureed food diet even though he had been released from Woodhull over a month earlier. Due to the lack of nourishment and nutrients, B.W. lost weight and became lethargic. K.W. confirmed that a pureed diet was medically unnecessary and asked that B.W. be taken off of it immediately.

90.     Eihab ignored K.W.'s requests for B.W. to be taken off the pureed diet. Only after over ten days of calling and emailing Abboud and other Eihab employees was K.W. able to confirm that Eihab had switched B.W.'s diet back to normal foods.

91.     As a result of Defendants complete failure to provide B.W. proper nourishment, B.W. weighed only 56 pounds in early April 2009. B.W. was 5 feet 8 inches tall and 22 years old.

92.     After K.W. demanded to know the steps Eihab planned to take to address B.W.'s dangerously low weight, Eihab's employees told A.W. and K.W. that they would take B.W. to a private medical doctor to review his weight. On information and belief, this appointment never occurred.

**B.W. Must Have a Feeding Tube Inserted**

93.     On or about the evening of April 8, 2009 or early morning of April 9, 2009, an Eihab employee (Lorna Blake) took B.W. to the emergency room of New York Hospital Queens because B.W. was vomiting small amounts of food, making gurgling noises, and had drastically lost weight.

94.     Upon admission, B.W. weighed a dangerously low 56 pounds. B.W. was 5'8" tall. Laboratory and radiological tests indicated that B.W. may have developed a hiatal hernia.

95.     When A.W. and K.W. discovered that B.W. was at the emergency room, they called the Pilling Street Home desperate to gather details about his hospitalization. Eihab staff

17

members at the Pilling Street House were reluctant to come to the phone. K.W.'s phone calls to Eihab's upper management were ignored. When K.W. phoned Abboud, Abboud stated that it was late and that she needed rest, and hung up the phone.

96.     Throughout the day of April 9th, no Eihab staff member contacted A.W. or K.W. to relay B.W.'s location, his status or condition, or whether he had been released from the hospital. A.W. and K.W. visited B.W. at the hospital after learning from DDSO that B.W. had been taken to the hospital. After staying in the hospital overnight, B.W. was discharged to the care of his family.

97.     As a result of B.W.'s rapid and drastic weight loss to only 56 pounds, doctors recommended that B.W. have a feeding tube surgically inserted to prevent B.W. from starving to death.

98.     On or about April 20, 2009, B.W. was admitted again to New York Hospital Queens for severe and dangerously low weight. On or about April 28, 2009, B.W. underwent surgery to have a feeding tube placed in his body. He stayed in the hospital after his surgery to recuperate.

99.     Eihab employees were responsible for providing one-to-one supervision and care for B.W. while he was in the hospital. However, Eihab employees neglected to provide the proper one-to-one supervision.

100.     For example, on or about April 24, 2009, hospital staff discovered that B.W. had removed a catheter line from his neck. The Eihab employee at B.W.'s bedside, however, could not explain how this occurred. On the same day, hospital staff discovered B.W. lying on the floor next to his bed.

18

101.    On another occasion, the day after B.W.'s feeding tube surgery, an Eihab employee finished her shift and left in the morning. No Eihab employee appeared to maintain the one-to-one supervision for B.W., thereby leaving him alone in the hospital while he recovered from surgery. When contacted A.W. and K.W., Eihab stated that it would send a staff member only at 4 p.m. that day, leaving B.W. alone for several hours and placing his health and safety at risk.

102.    On yet another occasion, hospital staff noted that B.W. had repeatedly removed mittens placed on his hands to prevent him from dislodging the newly-placed feeding tube. Removal of the feeding tube would have resulted in the perforation in B.W.'s stomach, a surgical emergency, and a threat to B.W.'s health and safety. If an Eihab employee had provided the proper one-to-one supervision, B.W. would not have removed the mittens several times.

103.    On one occasion, K.W. found two unopened cans of beer in the top drawer of B.W.' hospital nightstand that, on information and belief, belonged to an Eihab employee assigned to care for B.W. This Eihab employee continued to care for B.W. even after K.W. complained to Eihab about the employee's possession of beer while caring for B.W.

104.    B.W. remained in the hospital for approximately one month. While he recovered from his feeding tube surgery, B.W. developed pneumonia.

**Eihab Neglects B.W. as He Recuperates from Surgery and Pneumonia**

105.    On or about May 22, 2009, B.W. was discharged from the hospital to Ditmas Care Nursing Home in Brooklyn. Defendants still had legal responsibility to provide one-to-one supervision for B.W. while he recovered at the nursing home.

106.    A.W. and K.W. visited B.W. at the nursing home on the day of his discharge. Upon their arrival, Eihab employees (Jean-Pierre and another staffer) left the nursing home

without notifying A.W. and K.W. They did not return, again abandoning B.W. and failing to fulfill Eihab's duty to provide B.W. with one-to-one supervision.

107.   Over the next several days, A.W. and K.W. called Eihab repeatedly to warn Defendants of the danger of leaving B.W. alone without supervision and to inquire as to when Eihab would fulfill its responsibilities to B.W. Defendants did not send one of its employees to care for B.W. during this period.

108.   Only after repeated phone calls did an Eihab employee arrive on the evening of May 26, 2009 at the nursing home to provide one-to-one supervision to B.W.

109.   Early in the morning of May 27, 2009, B.W. was rushed to the Methodist Hospital emergency room from the nursing home due to a sudden drop in blood pressure.

110.   After several days in the hospital, B.W. was discharged back to Ditmas Care Nursing Home. He was later transferred to Meadow Park Nursing Home.

111.   During his stays at Ditmas Care Nursing Home and Meadow Park Nursing Home, Defendants neglected and failed to full their obligation to provide one-to-one supervision of B.W., including, but not limited to July 23, 2009.

112.   Defendants also failed to provide B.W. with adult diapers even though they were responsible for purchasing and providing these using B.W.'s governmental benefits. As a result A.W. and K.W. often purchased these supplies with their personal funds.

113.   A.W. and K.W. were desperately looking for another facility to take care of B.W., where he would not be abused, neglected, or at risk for his life.

114.   Finally, in August 2009, B.W. was accepted to a residential facility operated by the non-profit organization AHRC for individuals with developmental disabilities.

115.    Although B.W. was living at Meadow Park Nursing Home at this time,

Defendants remained responsible for transporting B.W. to AHRC for a weekly visit intended to

acclimate him to his new residence. Defendants repeatedly failed to transport B.W. to AHRC on

time for his weekly visits. On certain occasions, Eihab failed to pick up B.W. from Meadow

Park Nursing Home for his visits to AHRC.

116.    On or about October 30, 2009, A.W. and K.W. visited B.W. at Meadow Park

Nursing Home. Immediately upon entering B.W.' room, A.W. and K.W. were confronted with

the smell of urine. They found B.W. soaked and sitting in a puddle of urine on his bed.

117.    A.W. and K.W. spoke to the Eihab employee on duty, who informed them that

B.W. had not been taken to the bathroom for three hours. A.W. and K.W. reminded the

employee that Eihab employees, rather than nursing home staff, were required to take B.W. to

the bathroom every two hours since Eihab maintained responsibility for B.W.'s one-to-one

supervision and toileting.

118.    On or about November 3, 2009, K.W. called B.W. at the nursing home and spoke

to the Eihab employee on duty. The employee told K.W. that he had been informed by Eihab not

to take B.W. to the toilet at all.

119.    On or about November 4, 2009, K.W. called B.W. at the nursing home and spoke

to Andy, an Eihab employee on duty. Andy told K.W. that he refused to take B.W. to the

bathroom.

120.    K.W. subsequently learned from DDSO that Eihab claimed it was told that its

employees should not toilet or change B.W. when his feeding tube became dislodged. K.W.

pointed out that, even if Eihab's claim was true, B.W. only used his feeding tube during the night

21

and so Eihab remained responsible for B.W.'s toileting during the day. Eihab then switched positions and told DDSO that it never believed itself to be responsible for toileting B.W. at all.

121.   Eihab's claim was inexplicable given the months of toileting assistance, albeit haphazard, it had given B.W. at the nursing homes for several months.

122.   On or about November 2009, B.W. left Meadow Park Nursing Home and began living at AHRC's home in Queens, New York.

123.   Throughout the time that B.W. was under the supervision and care of Eihab, A.W. and K.W. repeatedly emailed, called, and spoke with Abboud regarding the inadequate supervision and care that Eihab employees provided B.W. A.W. and K.W. repeatedly requested Abboud to ensure that B.W. received proper one-to-one nourishment, medical treatment and attention, therapy, day program activities, and that their complaints regarding B.W.'s abuse and neglect were properly investigated. All of these requests related to obligations borne by Eihab pursuant to federal and state laws and implementing regulations. Abboud failed to respond to A.W. and K.W.'s requests, neglected to properly investigate their complaints of abuse and neglect, and did not take steps to ensure that B.W. was supervised and cared for properly.

124.   Throughout the time that B.W. was under the supervision and care of Eihab, A.W. and K.W. repeatedly emailed, called, and spoke with Jean-Pierre regarding the inadequate supervision and care that Eihab employees provided B.W., and specifically the supervision and care B.W. received at the Pilling Street Home. All of these requests related to obligations borne by Eihab pursuant to federal and state laws and implementing regulations. Jean-Pierre did not take steps to ensure that adequately trained Eihab employees provided the necessary level of supervision and care to B.W., that B.W. received prompt and thorough medical attention, that B.W. was properly nourished, that complaints of neglect and abuse were properly investigated,

and that changes to B.W.'s supervision and care were properly implemented so as to avoid
further neglect and abuse.

125. Throughout the time that B.W. was under the supervision and care of Eihab, A.W.
and K.W. repeatedly emailed, called, and spoke with Abu Hashish regarding the inadequate
supervision and care that Eihab employees provided B.W. and to request that thorough
investigations be performed regarding their complaints of neglect and abuse. All of these
requests related to obligations borne by Eihab pursuant to federal and state laws and
implementing regulations. Abu Hashish utterly failed to perform a complete and thorough
investigation of the complaints. Instead, Abu Hashish performed cursory investigations on
occasion intended to absolve Eihab and its employees of fault, and arrived at his conclusions
despite the weight of the evidence supporting A.W. and K.W.'s complaints of abuse and neglect.

126. All of the defendants had an obligation to ensure B.W.'s safety, life, proper care,
and proper treatment. But defendants failed miserably. Under defendants' watch, B.W. almost
died on multiple occasions, almost choked to death, almost starved to death, sustained multiple
bruises of allegedly unknown cause, and was otherwise treated almost subhumanly with regard
to his care.

127. As a direct and proximate result of the defendants' actions and those of their
officers, agents, servants, and employees, B.W. suffered severe physical and emotional injuries,
pain and suffering, the lost enjoyment of life, medical expenses, and money entrusted to Eihab
for his care.

128. B.W. suffered starvation, malnourished, a sudden and extreme weight loss, the
insertion of a feeding tube, extreme lethargy, and pneumonia. He sustained cuts, bruises, and

abrasions on his body while in the custody and care of Eihab, its officers, agents, servants, and employees.

129.    Normally a happy, affectionate and easy-going person, B.W. became serious and quiet, depressed, sad, and afraid to let go of his family members.

130.    Defendants' acts were reckless, willful, wanton, malicious, and grossly and criminally negligent, thus entitling plaintiff to an award of punitive damages.

**FIRST CLAIM FOR RELIEF**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(Against Eihab)**

131.    Plaintiff repeats and realleges the foregoing paragraphs of his complaint as though fully set forth herein.

132.    At all times material to this action, Defendant Eihab was a recipient of funds granted to the state of New York pursuant to the Medicaid Act and was therefore subject to Section 504 of the Rehabilitation Act.

133.    Plaintiff is an otherwise qualified individual and is disabled within the meaning of the Rehabilitation Act.

134.    Defendants, by all of the above, by failing to provide plaintiff with the necessary and proper care and supervision, and by abusing and neglecting plaintiff, denied plaintiff the opportunity to participate in and benefit from Eihab's services, programs, and activities and discriminated against plaintiff by reason of plaintiff's disability in violation of Section 504 of the Rehabilitation Act.

135.    Defendant Eihab, as the employer of each the individual defendants and its officers, agents, servants, and employees, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

24

## SECOND CLAIM FOR RELIEF
### Medicaid Act, 42 U.S.C. § 1320 *et seq.*, and
### the Federal Nursing Home Reform Act, 42 U.S.C. § 1396v, *et seq.*
### (Against Eihab)

136.     Plaintiff repeats and realleges the foregoing paragraphs of his complaint as though
fully set forth herein.

137.     The state of New York accepts federal funds under and therefore is required to
comply with the Medicaid Act and the regulations promulgated thereunder by the Secretary of
Health and Human Services.

138.     At all times material to this action, Defendant Eihab was a recipient of funds
granted to the state of New York pursuant to the Medicaid Act.

139.     At all times material to this action, Defendant Eihab operated a residential facility
that was under and subject to the requirements of the Medicaid Act, the Federal Nursing Home
Reform Act, and the regulations promulgated thereunder.

140.     At all times material to this action, Defendant Eihab represented and/or certified
to an agency of the state of New York that it satisfied the standards, provided the quality of care,
and provided to its residents the residential rights as required under federal law, the Medicaid
Act, including but not limited to 42 U.S.C. § 1395i-3(b) and § 1396r(g), and the Federal Nursing
Home Reform Act.

141.     Plaintiff was and is an eligible low-income person within the meaning of the
Medicaid Act.  During all times relevant to this action, plaintiff was a recipient and beneficiary
of Medicaid.

142.     Plaintiff was and is a person suffering from mental retardation and developmental
disabilities.

143.     Defendants, by all of the above, by failing to provide plaintiff with the necessary and proper care and supervision, and by abusing and neglecting plaintiff, violated the rights, protections, service, and level of care guaranteed to plaintiff by the Medicaid Act, the Federal Nursing Home Reform Act, and the regulations promulgated thereunder.

144.     Defendant Eihab, as the employer of each the individual defendants and its officers, agents, servants, and employees, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

### THIRD CLAIM FOR RELIEF
### New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.*
### (Against All Defendants)

145.     Plaintiff repeats and realleges the foregoing paragraphs of his complaint as though fully set forth herein.

146.     At all times relevant hereto, defendant Eihab owned and operated a place of public accommodation, a housing accommodation, and a publicly-assisted housing accommodation and, therefore, defendants and their officers, agents, servants and employees were required to comply with the Human Rights Laws of the State of New York, including N.Y. Exec. Law § 296.

147.     Plaintiff is disabled within the meaning of the New York State Human Rights Law.

148.     N.Y. Exec. Law § 296(2) provides that it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

149.    N.Y. Exec. Law § 296(2-a) provides that it is "an unlawful discrimination practice for the owner, lessee, sub-lessee, assignee, or managing agent of a publicly-assisted housing accommodation . . . [t]o discriminate against any person because of his . . . disability . . . in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."

150.    N.Y. Exec. Law § 296(5) provides that it is "unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of . . . a housing accommodation . . . [t]o discriminate against any person because of . . . disability . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith."

151.    Defendants, by all of the above, by failing to provide plaintiff with the necessary and proper care and supervision, and by abusing and neglecting plaintiff, denied plaintiff the accommodations, advantages, terms, conditions, and privileges, and services of a public accommodation, a housing accommodation, and a publicly-assisted housing accommodation by reason of his disability in violation of New York State Human Rights Law.  In addition, the aforementioned acts and practices of Defendants constitution aiding and abetting such discrimination.

152.    Accordingly, under N.Y. Exec. Law § 297, plaintiff is entitled to damages, including compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**New York City Human Rights Law, N.Y. C. Administrative Code § 8-107 *et seq.***
**(Against All Defendants)**

153.    Plaintiff repeats and realleges the foregoing paragraphs of his complaint as though fully set forth herein.

27

154. At all times relevant hereto, defendant Eihab owned and operated a place of public accommodation, a housing accommodation, and a publicly-assisted housing accommodation and, therefore, defendants and their officers, agents, servants and employees were required to comply with the New York City Human Rights Law, including N.Y.C. Admin. Code § 8-107.

155. Plaintiff is disabled within the meaning of the New York City Human Rights Law.

156. Defendants' conduct as described above constitutes an unlawful discriminatory practice to refuse, withhold from and deny plaintiff the advantages, facilities and privileges of a place of public accommodation because of his disability, in violation of New York City Admin. Code, § 8-107(4)(a).

157. Defendants' conduct as described above constitutes an unlawful discriminatory practice against plaintiff in the terms, conditions, and privileges of, and the furnishing of facilities and services in connection with a housing accommodation and a publicly-assisted housing accommodation because of his disability, in violation of New York City Admin. Code, § 8-107(5)(a)(2).

158. The Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

159. Accordingly, under the New York Administrative Code §8-502(a) and (f), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

160.    Plaintiff will serve a copy of the complaint upon the City Commission on Human Rights and Corporation Counsel, pursuant to the New York City Administrative Code § 8-502(c).

## FIFTH CLAIM FOR RELIEF
### Assault and Battery (Against Eihab)

161.    Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

162.    In assaulting, battering, and threatening plaintiff, or standing by and failing to intervene when plaintiff was assaulted, Eihab employees, acting in their capacities as Eihab's officers, agents, servants, and employees and within the scope of their employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Plaintiff.

163.    Defendant Eihab, as employer of each of the responsible individuals, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

## SIXTH CLAIM FOR RELIEF
### Negligence (Against All Defendants)

164.    Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

165.    Defendants owed plaintiff a duty to ensure that plaintiff's social, physical, and mental well-being was taken care of while plaintiff was a recipient of Defendants' residential and non-residential services, which included a duty to provide necessary and adequate supervision and care to plaintiff.

166.    Defendants possessed a duty under New York State Social Services Law and implementing regulations to ensure that plaintiff and plaintiff's rights were protected.

167.    Defendant Eihab, as operator and administrator of the Pilling Street Home and as

employer of the individual defendants and its officers, agents, servants, and employees, was responsible for the actions, policies, and practices that caused plaintiff to be neglected, abused, physically assaulted, and deprived of Eihab's services.

168.    Defendants voluntarily assumed responsibility for the health and well-being of plaintiff by operating, overseeing, and/or working in the Pilling Street Home and Eihab's day programs.

169.    Plaintiff had a reasonable expectation that defendants would provide the adequate and necessary care and supervision of his physical well-being and rights by virtue of being a recipient of Eihab's residential and non-residential services.

170.    Defendants breached their respective duties to plaintiff by all of the above, failing to provide necessary and adequate supervision and care of plaintiff, by abusing and neglecting plaintiff, by failing to provide information regarding plaintiff's health and injuries to plaintiff and his guardian, by failing to investigate allegations of abuse and neglect of the plaintiff, and by covering up facts demonstrating the abuse and neglect of the plaintiff.

171.    Defendants, their officers, agents, servants, and employees were responsible for Plaintiff's injuries as a result of the breach of their duties. Defendant Eihab, as employer of each of the responsible individuals, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

## SEVENTH CLAIM FOR RELIEF
### Negligent Hiring, Training, Supervision, Discipline, Staffing and Retention
### (Against Eihab)

172.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

173.    Defendant Eihab owed plaintiff a duty of care to hire, train, supervise, disclipine,

staff, and retain employees that could provide safe, secure, adequate, and necessary one-to-one
supervision, toileting, and other services in its Day Program and residential facilities to
developmentally disabled adults.

174.   Defendant Eihab, as well as their officers, agents, servants, and employees, owed
a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar
circumstances a reasonable, prudent and careful person should have anticipated that injury to
plaintiff or to those in a like situation would probably result from the foregoing conduct.

175.   Upon information and belief, defendant Eihab and their officers, agents, servants,
and employees were unfit and incompetent for their positions.

176.   Upon information and belief, defendant Eihab knew or should have known
through the exercise of reasonable diligence that defendants, their officers, agents, servants, and
employees were potentially dangerous to developmentally disabled adults like plaintiff.

177.   Upon information and belief, defendant Eihab's negligence in screening, hiring,
training, disciplining, and retaining defendants, their officers, agents, servants, and employees
proximately caused each of plaintiff's injuries.

## EIGHTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty (Against All Defendants)

178.   Plaintiff repeats and realleges the foregoing paragraphs of his complaint as though
fully set forth herein.

179.   At all times relevant hereto, each defendant possessed a fiduciary duty to plaintiff
to act in good faith, trust, and candor towards him.

180.   Defendants, acting as Eihab's officers, agents, servants, and employees and within
the scope of their employment, breached their respective fiduciary duties towards plaintiff by all
of the above, by failing to provide necessary and adequate supervision and care of plaintiff, by

31

abusing and neglecting plaintiff, by failing to provide information regarding plaintiff's health and injuries to plaintiff and his guardian, by failing to investigate allegations of abuse and neglect of the plaintiff, and by covering up facts demonstrating the abuse and neglect of the plaintiff.

181.    Defendant Eihab, as the employer of each the individual defendants and its officers, agents, servants, and employees, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

## NINTH CLAIM FOR RELIEF
### Fraud (Against Defendants Eihab and Abboud)

182.    Plaintiff repeats and realleges the foregoing paragraphs of his complaint as though fully set forth herein.

183.    Plaintiff relied on defendants to act in his best interest by protecting and taking care of him and by providing the necessary and adequate supervision and care of him.

184.    Defendant Abboud, acting as Eihab's officer, agent, servant, and employee and within the scope of and in furtherance of her employment, wantonly, deliberately and intentionally deceived plaintiff by promising to provide certain residential and non-residential services to plaintiff, including necessary and adequate one-to-one supervision and toileting care, social and community activities in the day program, to have B.W. regularly visited by occupational, physical and speech therapists, to facilitate B.W.'s attendance at and provide transportation to music therapy classes, and to ensure B.W.' safety and security while in the care and custody of Eihab.

185.    Defendant Abboud thereafter failed to fulfill these promises.

32

186.    Defendant Abboud's false and fraudulent statements and representations were made with the intent to have plaintiff select Eihab as his provider of adult residential and non-residential services.

187.    As a result of defendant Abboud's false and fraudulent statements and representations, plaintiff was injured and suffered damages.

188.    Defendant Eihab, as the employer of Abboud, is responsible for her wrongdoing under the doctrine of *respondeat superior*.

33

WHEREFORE, plaintiff respectfully request judgment against defendants as follows:

(A)    an order awarding compensatory damages in an amount to be determined at trial, including without limitation, damages for B.W.'s physical and emotional injuries, conscious pain and suffering; and loss of the enjoyment of life;

(B)    an order awarding punitive damages in an amount to be determined at trial;

(C)    reasonable attorneys' fees and costs; and

(D)    directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

Dated:  July 18, 2012
         New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP


Ilann Maazel (imaazel@ecbalaw.com)
Vasudha Talla (vtalla@ecbalaw.com)
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000
*Counsel for Plaintiff*

34